IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AUTUMN DAY TAYLOR, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:22-cv-00465 |
| ) | Judge Campbell / Frensley |
| VANDERBILT UNIVERSITY, ) | Jury Demand |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION AND BACKGROUND

This action stems from Defendant's COVID-19 testing requirements for students on the Vanderbilt campus and is before the Court upon Defendant's Motion to Dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6). Docket No. 9. For the reasons discussed below, the undersigned finds that Plaintiff cannot establish that she was a Vanderbilt employee, and that accordingly, she cannot sustain her claims under the Genetic Information Nondiscrimination Act ("GINA") or the Americans with Disabilities Act ("ADA"). The undersigned further finds that, even if Plaintiff had been a Vanderbilt employee, Plaintiff's Complaint fails to state a claim under the ADA or GINA. Accordingly, the undersigned recommends that Defendant's Motion to Dismiss (Docket No. 9) be **GRANTED**.

### II. SUMMARY OF THE ARGUMENT

The Defendant argues that this action should be dismissed because Plaintiff, as a Vanderbilt student and not a Vanderbilt employee, lacks standing to sue under the Genetic Information Nondiscrimination Act ("GINA"), the Americans with Disabilities Act ("ADA"), and Title VII of the Civil Rights Act ("Title VII"). Docket No. 10. Defendant additionally argues that this action should also be dismissed because: (1) it did not subject Plaintiff to a genetic test as defined by

GINA; (2) the Complaint fails to state a prima facie case under the ADA; and (3) the Complaint fails to state a prima facie case under Title VII. *Id.* Defendant argues, therefore, this case should be dismissed with prejudice. *Id.*

Plaintiff, who is proceeding pro se, has filed a Response to Defendant's Motion. Docket No. 11. In her Response, Plaintiff argues that the issuance of the EEOC's Right to Sue letter establishes that, as a graduate research assistant, she is a Vanderbilt employee. *Id.* Plaintiff further argues that her employment status is reinforced by "Columbia University, 364 NLRB No. 90 (August 23, 2016)"; by the fact that she was required to submit an I9 before beginning her research assistant position, and by the fact that she receives a W2 from Vanderbilt each year. *Id.*

With regard to her GINA claim, Plaintiff concedes that "she can make no assumption of what was 'actually' done with her genetic information, [but] her attempts to get answers to those questions were dismissed and returned with malicious threats to her livelihood." *Id.* Plaintiff argues that "Defendant remains unable to prove there was ever an actual COVID-19 test performed on [her] genetic sample, and the mere appearance of 'results' does not indicate a basic adherence to federal regulation." *Id.* Plaintiff also maintains that Defendant tampered with the test kits. *Id.*

As to her ADA claim, Plaintiff argues that "Defendant regarded her as disabled when they applied discriminatory genetic monitoring requirements on her and some of her peers." *Id.* Specifically, Plaintiff contends that "Defendant perceived her as having a higher affinity for contracting and spreading the disease known as COVID-19 than some people she regularly associated with." *Id.* Plaintiff acknowledges that she "is unable to directly point to the single quality by which Vanderbilt is choosing to arbitrarily discriminate, just that there are exponentially smaller populations of people by which Vanderbilt has specific and humiliating burdens placed on." *Id.*

2

In response to Defendant's Title VII arguments, Plaintiff states, "Plaintiff believes Defendant misunderstands her GINA and ADA claims and their inherent relationship to the Civil Rights Act of 1964, ergo the 'vague allusions to violations of Title VII.'" *Id.* Plaintiff reiterates that "discriminatory actions were taken based on Defendants [*sic*] perception of her as disabled." *Id.* Thus Plaintiff does not assert a claim under Title VII.

Defendant has filed a Reply to Plaintiff's Response, reiterating its contention that Plaintiff's claims fail because she is a student, not an employee, and therefore lacks standing to bring claims under GINA and the ADA. Docket No. 12. Defendant additionally replies that both Plaintiff's GINA and ADA claims are conclusory. *Id.* Specifically, Defendant argues that Plaintiff "points to no well-pleaded allegation that Vanderbilt required her to submit to genetic testing as defined by the Act," but instead, simply "asserts that because Vanderbilt cannot show that it did not require her to undergo genetic testing, Vanderbilt must have violated GINA," which "turns the Rule 12 pleading standard on its head." *Id.* Defendant further argues that Plaintiff's Complaint fails to identify with any specificity Plaintiff's alleged disability or perceived disability and additionally fails to identify any alleged adverse employment action. *Id.* Moreover, Defendant argues that Plaintiff's Complaint itself establishes a legitimate basis for its testing requirements: Plaintiff was unvaccinated from COVID-19. *Id.*

### III. Allegations of Plaintiff's Complaint and Defendant's COVID-19 Testing Program

Plaintiff filed her pro se Complaint pursuant to and Genetic Information Nondiscrimination Act of 2008 ("GINA"), 42 U.S.C. § 2000ff, *et seq.* and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* Docket No. 1.[1] Plaintiff alleges that, in requiring her to

---

[1] Plaintiff additionally alleges that Defendant violated 21 U.S.C. § 9, subchapter V, the Federal Food, Drug, and Cosmetic Act. Docket No. 1. Because the Federal Food, Drug, and Cosmetic Act

submit to repeated COVID testing, Defendant engaged in unlawful employment practices and misused medical devices regulated by the FDA. *Id.* Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages. *Id.* Plaintiff additionally seeks written confirmation of the test data as well as proof of destruction of all of her samples. *Id.*

Plaintiff filed a Charge of Discrimination with the Tennessee Human Rights Commission ("THRC") and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon disability and "genetic information." Docket No. 1-2. Plaintiff received her Right to Sue letter, and thereafter timely-filed the instant action. *Id.*

In light of the COVID-19 pandemic, Defendant implemented comprehensive Return-to-Campus protocols to ensure the health and safety of students, faculty, and staff. Pursuant to these Return-to-Campus protocols, all undergraduate and graduate students who were authorized to be on campus and engaged in on-campus activities in the fall semester of the 2020-21 academic year were required to execute a Return-to-Campus Acknowledgment ("Acknowledgment"). Docket No. 1-3 at 4. By signing the Acknowledgment, students agreed to "submit to regular COVID-19 testing if and when VU requires." *Id.*

At the time, Plaintiff was a graduate student at Vanderbilt's School of Engineering, and, because her academic research necessitated her physical presence on Vanderbilt's campus, Plaintiff was required to, and did, execute the Acknowledgment before returning to campus for the fall semester. Docket No. 1-3 at 6 and 51.

As part of the "surveillance testing program" Vanderbilt instituted "to slow the spread of COVID-19 on campus," Plaintiff received, on August 29, 2020, an email from Dean Mark Wallace

---

does not provide a cause of action for private citizens, the undersigned will not analyze this claim. *See* 21 U.S.C. §§ 333, 335.

informing her that she had been selected to complete a school-provided COVID-19 test by September 4, 2020. Docket No. 1-3 at 6. Dean Wallace's email explained the testing program, included information about the type of COVID-19 test that would be administered, provided instructions for picking up a test, and stated that "[f]ailure to comply can result in academic penalties." Docket No. 1-3 at 7-8. The email explained that the COVID-19 tests being used were provided through a partnership with Vault, "a leading national provider of at-home saliva test kits." *Id.*

The Vault was approved by the U.S. Food and Drug Administration ("FDA") for emergency use to detect COVID-19 on May 7, 2020. Docket No. 1-3 at 11. The test uses a polymerase chain reaction and works by detecting the presence of nucleic acid of SARS-CoV-2, the virus that causes the COVID-19 disease, in a respiratory specimen. Docket No. 1-3 at 8 and 12.

The FDA-issued authorization letter states:

To use your product, SARS-CoV-2 nucleic acid is first extracted, isolated, and purified from in oropharyngeal (throat) swab, nasopharyngeal swab, anterior nasal swab, mid-turbinate nasal swab, saliva and bronchoalveolar lavage (BAL) fluid. The purified nucleic acid is then reverse transcribed into cDNA followed by PCR amplification and detection using an authorized real-time (RT) PCR instrument.

Docket No. 1-3 at 12-13.

Upon being instructed to take a COVID-19 test, Plaintiff emailed Vanderbilt Professor David S. Kosson expressing her concern about sending her "entire genetic code" to a "medical company that does hormone procedures as a regular business but has generously stepped into the COVID-19 market." Docket No. 1-3 at 5. Plaintiff's email included 17 questions regarding her requirement to be tested and the testing process. Docket No. 1-3 at 5-6. The email also included what Plaintiff deemed "concerning" excerpts from Vanderbilt's August 29, 2020 email. Docket

5

No. 1-3 at 6.

Defendant's Command Center Testing Team responded to Plaintiff's email on September 2, 2020, answering her questions. Docket No. 1-3 at 4-5. VU's Command Center Testing Team's email explained:

> The lab that processes samples is a Clinical Laboratory Improvements Act of 1988 (CLIA) certified high-complexity laboratory – meaning it must meet certain federal quality standards for how it processes each individual sample. The lab performs only a PCR test for COVID-19; it does not and is not equipped to conduct DNA testing. The results will be shared with you via email (if you so elect) or through the secure Vault website, and the results are similarly shared with the university's Public Health Central Command Center through a secure portal. In turn, the university uses the test results only for the limited purpose of identifying and responding to positive cases, identifying close contacts, and managing quarantine and isolation.

*Id.*

The following day, on September 3, 2020, Plaintiff sent another email acknowledging that many of her questions had been answered but making nine demands of Defendant. Docket No. 1-3 at 3-4. In her email, Plaintiff expressed concern that the laboratory could theoretically run genetic analysis on her genetic information as provided through the COVID-19 test because the laboratory in which the tests would be processed had human genetic testing capabilities. Docket No. 1-3 at 2. Defendant responded the same day acknowledging Plaintiff's concerns, informing her of her right to opt out of the testing program, and giving her the option to elect "remote-only" study if she chose not to participate. Docket No. 1-3 at 1.

On September 24, 2020, twenty days after Defendant's original deadline, Plaintiff took a COVID-19 test through Defendant's testing program. Docket No. 1 at 5. Plaintiff submitted a second test administered by Defendant in partnership with Vault on November 3, 2020. Docket No. 1 at 6.

On January 13, 2021, Plaintiff was informed that all School of Engineering graduate and

professional students would be tested before classes started and weekly throughout the semester. Docket No. 1-3 at 66. By then, Defendant had begun working with Shield T3 to provide COVID-19 tests. Docket No. 1-3 at 64. The Shield T3 test was only intended for use as a screening tool to keep students safe. Docket No. 1-3 at 62. Because it was not used as a diagnostic test, it did not require emergency use authorization from the FDA. *Id.* As a lab-developed test, however, the Shield T3 test was subject to regulation by the FDA through the Public Health Service Act and the test's approval for emergency use authorization was pending. *Id.* Like the Vault test, the ShieldT3 test was only authorized for detection of the SARS-CoV-2 virus. Docket No. 1-3 at 12.

On January 28, 2021, Professor Jamey Young, Director of the Graduate Program in Chemical Engineering, emailed Plaintiff informing her that she was out of compliance with university guidelines regarding "arrival testing" and her spring registration would be cancelled if she failed to comply with weekly testing or elect "remote status." Docket No. 1-4 at 3.

On January 31, 2021, Plaintiff revoked her consent to be tested from the previous semester, stating in part, "my consent has only been supplied under duress." Docket No. 1-3 at 61. The following day, Defendant's Deputy General Counsel Michelle Tellock responded to Plaintiff's email, advising her not to go to the testing center for COVID-19 testing because she claimed to have provided her consent under duress. Docket No.1-3 at 60.

Between February 2, 2021 and February 5, 2021, Plaintiff exchanged multiple emails with Ruby Shellaway, Vice Chancellor, General Counsel, and University Secretary. Docket No. 1-4 at 5-10. In this exchange, Plaintiff again raised her concerns about Defendant's testing program, which included misinterpretations of the information Defendant had provided. Docket No. 1-4 at 8-9. Plaintiff closed her email stating, "I pray you will be able to provide answers to my questions so that we can reestablish that my peers and I must continue to enjoy the rights afforded to us as

Children of God, Citizens, and Employees." Docket No. 1-4 at 9.

Vice Chancellor Shellaway responded to Plaintiff's email on February 5, 2021, acknowledging Plaintiff's concerns, assuring her that Defendant's polities comply with applicable law, and giving her the option to consent to the test or withdraw her registration for the remainder of the semester. Docket No. 1-4 at 7. Later that day, Plaintiff withdrew her objection and renewed her consent to be tested. Docket No. 1-4 at 6. Plaintiff was tested the same day and again roughly once each week from that date forward, with her last test being administered on February 8, 2022. Docket No. 1-4 at 70-71.

On August 17, 2021, Plaintiff filed a Charge of Discrimination with the Tennessee Human Rights Commission ("THRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the ADA and GINA. Docket No. 1-4 at 40-45. The EEOC declined to pursue Plaintiff's claims, and a Notice of Right to Sue letter was issued on March 9, 2022. Docket No. 1-4 at 65-69. Plaintiff thereafter filed suit. Docket No. 1.

## IV. LAW AND ANALYSIS

### A. Motion to Dismiss - Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Id.*

The court will construe the complaint in the light most favorable to the nonmoving party, accept its allegations as true, and draw all reasonable inferences in favor of the nonmoving party.

*See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the pleadings contain "a short and plain statement of the claim" that will provide fair notice of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8.

A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient. *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Id*. At 1965, 1974. *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has addressed the current appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . . Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

556 U.S. at 678-79 (citations omitted).

### B. Americans with Disabilities Act of 1990 - 42 U.S.C. § 12111, et seq.

The Americans With Disability Act ("ADA") protects employees from discrimination based on their disabilities, and provides, in part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

In order to sustain an ADA claim, an employee must first make out a prima facie case of discrimination by establishing that:

1. he or she is an individual with a disability;

2. he or she is otherwise qualified for the position, with or without reasonable accommodation;

3. he or she suffered an adverse employment decision;

4. the employer knew or had reason to know of the plaintiff's disability; and

5. the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). *See also* 42 U.S.C. §§ 12111 and 12112.

The ADA protects employees against retaliation for opposing activities that are otherwise unlawful under the ADA. Specifically, the ADA's anti-retaliation provision states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203.

Claims brought under the ADA are evaluated under the same *McDonnell Douglas-Burdine* tripartite test utilized in Title VII cases. The *McDonnell Douglas-Burdine* tripartite test requires the plaintiff to first establish a prima facie case of discrimination. If the plaintiff is able to do so, a mandatory presumption of discrimination is created and the burden shifts to the defendant to

articulate some legitimate, nondiscriminatory reason for the employee's rejection. If the defendant carries this burden, the plaintiff must then prove that the proffered reason was actually pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as later clarified by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The plaintiff may establish pretext by showing that, 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; and 3) that the stated reasons were insufficient to explain the defendant's action. *Id.* "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

      **C.**     **Genetic Information Nondiscrimination Act of 2008 – 42 U.S.C. § 2000ff, et seq.**

The Genetic Information Nondiscrimination Act of 2008 ("GINA") prohibits an employment agency to request, require, or purchase genetic information with respect to an employee or family member of the employee. 42 U.S.C. § 2000ff-2(b).

GINA defines "genetic information" as information from a genetic test or the "manifestation of a disease or disorder in family members." 42 U.S.C. § 2000ff(4)(A). A "genetic test" under GINA means "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detects genotypes, mutations, or chromosomal changes." 42 U.S.C. § 2000ff(7)(A). Thus, in order for an employer to be held liable, it must "request, require, or purchase" information from "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detects genotypes, mutations, or chromosomal changes" or it must "request, require, or purchase" the "manifestation of a disease or disorder in family members." 42 U.S.C. 42 U.S.C. §§ 2000ff(4)(A); 2000ff(7)(A).

### D. The Case at Bar

As an initial matter, both the ADA and GINA are applicable to employers and employees. *See* 42 U.S.C. § 12111, et seq.; 42 U.S.C. § 2000ff, et seq. An essential element of claims under either statute is, therefore, that the plaintiff is an employee. *See id.* Thus, the threshold question before the Court is whether Plaintiff, as a graduate student research assistant, is an employee for purposes of claims under the ADA and GINA.

Courts in the Sixth Circuit confronting the question of whether a graduate student assistant is an "employee" under Title VII generally apply the "economic realities test" and examine whether the plaintiff's claims relate principally to activities as a graduate student or as an employee. *See, e.g., Ivan v. Kent State Univ.*, 863 F. Supp. 581, 585 (N.D. Ohio 1994), *aff'd* 92 F.3d 1185 (6th Cir. 1996); *Kovacevich v. Vanderbilt Univ.*, No. 3:09-0068, 2010 WL 1492581, at *14 (M.D. Tenn. Apr. 12, 2010); *Al-Maqablh v. Univ. of Cincinnati Coll. Of Med.*, No. 1:11-cv-531, 2014 WL 2048126, at *3 (S.D. Ohio May 19, 2014).

The evidence before the Court establishes that Plaintiff was treated as a student, not as an employee. As acknowledged by Plaintiff, the COVID-19 testing was mandated for students only. Docket No. 1, ¶¶ 11, 14, 31, 33, 35, 37, 39, 41, 44, 50, 52. Additionally, the mass emails Plaintiff received were addressing recipients as "graduate students," "VUSE Students," and "Students." Docket No. 1-3 at 6 and 66; Docket No. 1-4 at 1. Plaintiff was given the option to refuse testing and study remotely. Docket No. 1-3 at 51. Moreover, the consequence faced by Plaintiff for non-compliance with the testing requirements was to have her spring registration be cancelled. Docket No 1-4 at 3. Because Plaintiff cannot establish that she was an employee of Defendant, Defendant cannot be held liable to her under either the ADA or GINA.

Even if Plaintiff were to have been an employee of Defendant, however, Plaintiff is unable

to sustain her ADA claims because Plaintiff has failed to establish the elements of a prima facie ADA claim. Specifically, Plaintiff has failed to establish: (1) either that she is disabled or that Defendant regarded her as disabled; (2) that she was otherwise qualified for her position, with or without reasonable accommodation; (3) she suffered an adverse employment action because of her disability; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Monette,* 90 F.3d at 1186 (6th Cir. 1996). *See also* 42 U.S.C. §§ 12111 and 12112. Absent allegations related to each element of her claim, Plaintiff cannot sustain the claim.

With regard to her GINA claim, even if Plaintiff were to have been an employee of Defendant, she would nevertheless not be able to prevail on her GINA claim because Plaintiff's Complaint fails to allege that Defendant coordinated or otherwise participated in the analysis of her genetic information, and because neither the Vault nor the Shield T3 tests are genetic tests as defined by GINA and the FDA authorizations for both tests do not permit the tests' usages outside of detecting the SARS-CoV-2 virus. Docket No. 1-3 at 11; Docket No. 1-14 at 11 and 12. While Plaintiff takes issue with the fact that the labs that process the tests are equipped with technology capable of analyzing human genetic information, Plaintiff never alleges that they did. Moreover, the record is devoid of any evidence suggesting that her "human DNA, RNA, chromosomes, proteins, or metabolites" were actually analyzed, and requiring the submission of a respiratory specimen alone does not violate GINA. *See* 42 U.S.C. § 2000ff(7)(A). *See also* Docket No. 1-3 at 11; Docket No. 1-4 at 12. Absent such, Plaintiff cannot prevail on her GINA claim.

## V. CONCLUSION

For the reasons discussed above, the undersigned finds that Plaintiff cannot establish that she was a Vanderbilt employee, and that accordingly, she cannot sustain her claims under GINA

or the ADA. The undersigned further finds that, even if Plaintiff had been a Vanderbilt employee, Plaintiff's Complaint fails to state a claim under the ADA or GINA. Accordingly, the undersigned recommends that Defendant's Motion to Dismiss (Docket No. 9) be **GRANTED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
United States Magistrate Judge